ALLAN J. HAMILTON, Indiv. and as Trustee, *et al.*, Plaintiffs-Appellees, v. J. McDONALD WILLIAMS *et al.*, Defendants-Appellants.

Second District   No. 2—89—1335

Opinion filed May 15, 1991.—Rehearing denied July 8, 1991.

232

■

F. Samuel Eberts III and Carol A. Tiesi, both of Jones, Day, Reavis & Pogue, and Dan K. Webb, of Winston & Strawn, both of Chicago, and John Edwin Norton, of O'Reilly, Cunningham, Norton & Mancini, of Wheaton (Daniel E. Reidy and James E. Daly, of counsel), for appellants.

Peter Flynn and William R. Coulson, both of Cherry & Flynn, of Chicago, and Schirott & Associates, P.C., of Itasca (Myron M. Cherry and James R. Schirott, of counsel), for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

If, indeed, the object of arbitration is to achieve the final disposition of disputes in an easier, more expeditious and less expensive manner than by litigation (*Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600* (1981), 102 Ill. App. 3d 681), this case is arbitration gone seriously awry. Following receipt of the arbitrator's award in July 1987, its subsequent vacation, ordered rearbitration and denial of vacation of the rearbitration award, more than three years' time has passed, 12,000-plus pages of pleadings and reports of proceeding have been generated and untold amounts of time and money have been expended. The parties, now on this court's doorstep, are still pointing fingers at each other. Given the history of this cause, final resolution in this penultimate forum seems unlikely, but "Hope springs eternal."

The defendants, collectively referred to hereafter as Crow, a nationwide real estate organization headquartered in Dallas, Texas, and the plaintiffs, who will be referred to collectively herein as Hamilton Partners (including primarily within that designation Messrs. Hamilton, Lunt and Wauterlek), became embroiled in litigation when Hamilton, Lunt, Wauterlek and all of their partners in the Itasca, Illinois, headquarters of Crow's Great Lakes Region abruptly resigned from Crow in January 1987 and formed Hamilton Partners. Various Hamilton and Crow partners and entities were partners in over 200 project partnerships in the Great Lakes Region, including some 56 in the Chicago/Du Page County area. The resignations automatically triggered the buy-sell procedures of the various limited partnership agreements. Crow's rejection of Hamilton Partners' initial buyout proposal and indication of an intention to exercise its option to buy Hamilton Partners out of the Crow partnerships precipitated the filing of three lawsuits in Du Page County and one suit in a Texas State court.

Concurrent settlement negotiations culminated in a June 17, 1987, letter of Intent (Letter of Intent) wherein the parties agreed to a division of the properties and to an arbitration procedure for valuing those properties upon which the parties could not otherwise agree. It was agreed the three actions pending in Du Page County would be consolidated and dismissed, and the court would retain jurisdiction to enforce the Letter of Intent.

In the event the parties could not agree on the value of certain properties within the allotted 10-day period, the Letter of Intent provided that the values would be determined in accordance with section 1.2(b) thereof, to wit:

> "*Sudler Marling, Inc. and American Appraisal Associates, Inc. will be directed by the Hamilton Partners and TCC [Crow], respectively*, to deliver by July 11, 1987 to TCC and to the Hamilton Partners their determination of the value of the Hamilton Interest and TCC Interest with respect to each of the Initial Closing Properties whose purchase price was not agreed upon by TCC and Hamilton Partners. The determination will be made in accordance with the instructions set forth in Subsection 1.2(c) below. Subject to each party's compliance with Section 4.7 [relating to access to records of the partnership that currently owns the property], *if any report with respect to a determination of value is not delivered in a timely manner, the first determination to be delivered will be conclusive and binding on the parties*. The parties will attempt to resolve any differences in the appraisers' determinations with respect to specific interests by July 13, 1987,

*failing which Cushman & Wakefield (the 'Arbitrator') will review the determination for each Initial Closing Property on which the appraisers do not agree, inspect those Initial Closing Properties and, solely on the basis of this review, its inspection, and any information it may request from the parties, arbitrate the dispute.* It will deliver its determination of the values of the TCC Interests and Hamilton Interests in those Initial Closing Properties to TCC and Hamilton no later than July 17, 1987. This determination will be conclusive and binding upon the parties." (Emphasis added.)

The Letter of Intent contemplated that purchase of the interests in a substantial number of the various project partnerships would occur at an initial closing on July 22, 1987, and a second closing would deal with the remaining project partnership interests. The most significant individual partnership properties included in the initial closing were the vacant land parcels of Allen Hamilton's two Itasca namesake developments, Hamilton Lakes Office Park (Office Park) and Hamilton Lakes Business Park (Business Park).

Because the parties could not agree on the value of these two Hamilton Lakes properties by June 27, the appraisal arbitration mechanism provided for in the Letter of Intent was activated. The parties have provided commendable minutely detailed and thoroughly record-referenced statements of facts as to the what and why of the events which led to the submission of the matter of the Hamilton Lakes properties' valuations to arbitration. Condensing this material we find the following background is presented.

The initial market information Crow received from its appraiser, American Appraisal Associates, Inc. (hereinafter American), a Milwaukee-based corporation, on the Hamilton Lakes properties was not of the quality Crow desired. It became concerned that American would either not be able to meet the deadline for submission of the appraisal or, if it did, that its appraisal would not meet Crow's expectations of quality. Consequently, it sought out and hired Jared Shlaes of Chicago-based Shlaes & Company to appraise the Hamilton Lakes Office Park property. When Shlaes learned later from Crow that John T. Ryan of Cushman & Wakefield was to be the arbitrator, Shlaes disclosed to Crow that he and Ryan had worked together 13 years ago, but Shlaes told Crow that he did not believe that past relationship would be a problem for the arbitration. Crow expanded Shlaes' assignment to include the Business Park property as well. American was told to stop work on the Hamilton Lakes properties, to turn over its work product to Shlaes and lend whatever assistance Shlaes needed.

Shortly before the appraisals were due to be exchanged between the parties, Crow began to worry that its use of Shlaes rather than American might be viewed by Hamilton Partners as a technical breach of the Letter of Intent. Crow then essentially bullied American into assuming the appearance of a contractor/subcontractor relationship with Shlaes. At the time, Crow owed American over $1 million in fees, and, although American had no interest in a contractor/subcontractor relationship with Shlaes, and Shlaes did not have any interest in such a relationship with American, American nonetheless agreed to help Crow with what Crow termed was a "legal problem." Thereafter, Crow caused alterations to be made by American to appraisal cover sheets and transmittal letters to show that Shlaes prepared the appraisals at American's request, rather than Crow's as originally shown on the cover sheets, and that American had "adopted" Shlaes' appraisal reports in addition to having "accepted [them] as correct."

Pursuant to the Letter of Intent, Crow and Hamilton Partners received the appraisers' reports on July 11. Shlaes' appraisal reports for Crow valued the Office Park at $22.8 million and the Business Park at $14.8 million. Hamilton Partners' appraiser, Sudler Marling, Inc., valued the Office Park at $67.29 million and the Business Park at $22.5 million.

Upon receipt of the Crow appraisals along with the altered transmittal letters and cover sheets, Hamilton, Lunt, and Wauterlek were variously "surprised," "concerned," "upset," "confused," or "alarmed" when they saw the appraisal reports were prepared by Shlaes rather than American and felt the matter "needed to be investigated." All three recognized that American was to prepare the appraisals under the terms of the Letter of Intent. Hamilton testified he did not know at that time whether "if American appraisal was shorthanded, it would be permissible under the Letter of Intent for Shlaes to have become involved," and Wauterlek testified he did not do anything in reaction to seeing Shlaes' name on the reports because "it also had American Appraisal on a cover letter." Lunt said he was "unclear" as to the import of the cover sheets and transmittal letters and as to whether "the Shlaes reports tendered by Crow were American Appraisal appraisals within the meaning of the Letter of Intent." Lunt also said he "considered the possibility" that American might have subcontracted the Hamilton Lakes appraisals to Shlaes but that "in that time frame [July 11 through 20] was unclear" as to whether such subcontracting was permissible. Despite its confusion and uncertainty, Hamilton Partners determined to proceed with the arbitration. Its consensus was that the Shlaes reports were of such poor quality and reflected values that were so unreasonably low that the arbitrator could not possibly agree with them, and, therefore,

the Shlaes reports could provide a strategic advantage to Hamilton Partners. Making no objection to the use of Shlaes then or anytime before the arbitrator's decision was received July 20, the appraisal reports were forwarded to the arbitrator, John T. Ryan, on July 13.

In an *ex parte* telephone conversation between Hamilton Partners' Lunt and the arbitrator, John Ryan, on July 14, Lunt learned that Ryan had worked for Shlaes 13 years earlier, but Ryan told Lunt he did not believe this created any conflict for him. When Lunt queried Ryan as to the matter of American's subcontracting the Hamilton Lakes appraisals to Shlaes, Ryan stated it was "unusual" for an appraisal company to submit a report actually done by another appraisal company on a project the size of Hamilton Lakes but that it does sometimes happen. After this conversation, Lunt described himself as "relieved" and satisfied that Ryan's former employment by Shlaes would not be a problem for the arbitration. Lunt testified it was his belief at that time that Shlaes had been brought into the project by American, not Crow.

Later on the 14th, Hamilton Partners met with its lead real estate attorney, Joel Rubin, who was a primary negotiator on the Letter of Intent and intimately familiar with its terms. Hamilton Partners' concern about the use of Shlaes was not discussed with Rubin at that time, however. The next day, July 15, Rubin confirmed by letter of instruction to the arbitrator that he was to arbitrate the value of the Hamilton Lakes properties based on the American/Shlaes reports submitted by Crow. Another letter to the arbitrator dated July 16 indicated the appraisers would make a joint, not separate, oral presentation to the arbitrator on July 17 to clarify any discrepancies or answer questions. This letter was copied to Shlaes but not American at the request of Crow's Jon Hammes; Rubin and Hammes did not discuss the reason for Hammes' request.

In a meeting on July 17 between Hamilton Partners' Lunt and Crow's Manske at which Crow's Hammes was also present, Lunt "jokingly" commented to Hammes after Manske left the room at one point that Crow had not been straightforward in bringing Shlaes into the process without first informing Hamilton Partners or obtaining its approval. Hammes responded that American "needed assistance" to complete the work and that Manske had contacted a former professor of his and Hammes', Professor Graaskamp, for a recommendation of an alternate appraiser. Graaskamp recommended Shlaes. Hammes thereafter either called or called upon Shlaes. Lunt told Hammes at that same meeting on July 17 about his *ex parte* telephone conversation with Ryan during which Ryan disclosed his prior relationship with Shlaes and that Ryan assured him that there was no problem. Lunt testified he was giv-

ing Hammes "a hard time" and was "kind of saying, 'Jon, you could have really gotten in trouble if [the Ryan/Shlaes past employment relationship] would have been a real serious conflict.' " Lunt testified his "joking" manner reflected the mental state of his no longer being upset about the use of Shlaes since at that time he had resolved in his mind to go forward with the arbitration even knowing that the appraisals were Shlaes' and that Shlaes had previously employed Ryan.

That same day, July 17, in accordance with the procedures outlined in attorney Rubin's July 15 letter, the appraisers, Sudler Marling, Inc., for Hamilton Partners and Shlaes & Co. for Crow, made their presentations to the arbitrator. The arbitrator's decision was expected to be received on July 20.

An hour or so prior to the arrival of the arbitrator's decision on July 20, Hamilton Partners' Wauterlek and Hamilton were meeting with Crow's Woodhouse regarding property other than Hamilton Lakes. When the topic of the arbitration came up, Hamilton recalled that Woodhouse indicated that Crow was "pretty confident" about the values coming in at $25 million because of the Shlaes-Ryan relationship in that Shlaes put Ryan into the appraisal business. Hamilton Partners' Wauterlek's recollection was that Woodhouse said that the numbers which were going to come in on the arbitration were the numbers that were on the Crow appraisals and that he would not blame Hamilton Partners for being upset because it, in fact, was "going to be screwed" because Shlaes had put Ryan into business. Wauterlek stated Woodhouse said Crow's Hammes was the source of his information. Woodhouse testified somewhat differently, stating that he mentioned to Hamilton that Crow's Hammes felt that Hamilton Partners' numbers were off in left field whereas Crow's numbers were supportable. He also told Hamilton that Crow's Hammes had told him (Woodhouse) that there was a relationship between Ryan and Shlaes. Woodhouse further testified that Hammes "may have" told him (Woodhouse) that he knew of the Ryan-Shlaes relationship when he selected Shlaes, but Woodhouse denied he told this to Hamilton.

The arbitrator's decision delivered shortly after the Woodhouse conversation occurred determined the value of the Office Park to be $25 million and the value of the Business Park to be $15 million. These values were very close to the Shlaes appraisals ($22.8 million and $14.8 million) and a combined total of nearly $50 million less than the Sudler Marling appraisals ($67.29 million and $22.5 million).

Two days later, after consulting with counsel, Hamilton Partners filed an emergency motion to enforce the Letter of Intent and apply the "Draconian" remedy on the grounds that (1) Crow's use of an appraisal

prepared—not by American as specified in the Letter of Intent—but, rather, by Shlaes & Company, even if Shlaes was operating as a subcontractor of American, was a breach of the Letter of Intent and (2) Shlaes' prior employment relationship with the arbitrator, Jack Ryan of Cushman & Wakefield, fatally tainted the arbitration. Hamilton Partners urged that Crow's breach of the Letter of Intent by delivering the Shlaes appraisal rather than one from American was tantamount to the delivery of no appraisal in which event the "Draconian" remedy provided in section 1.2(b) of the Letter of Intent set forth above should be applied, *i.e.*, the first appraisal to be delivered (Hamilton Partners', that is) would be deemed conclusive and binding on the parties.

Crow's response to this motion advanced its position that the use of Shlaes was proper and permissible since Shlaes was acting as American's subcontractor. Appended thereto were the various documents purporting to show there was a subcontract: the altered cover sheets and transmittal letters and a copy of a subcontract between American and Shlaes & Co. purportedly agreed to and accepted by Shlaes as of July 7 but actually not prepared until July 13 and signed by Shlaes "just to get rid of the piece of paper" until sometime after that date. Crow subsequently moved for summary judgment and to stay discovery on that same basis supported by affidavits of American's Paul Gross (which affidavit Gross later testified contained false statements), Shlaes, Crow's Hammes, and others.

In subsequent proceedings, the court granted summary judgment as to the issue of whether the prior employment relationship between Shlaes and Ryan was a fatal conflict of interest—finding that it was *not*—and finding that Hamilton Partners' Ronald Lunt was acting as an agent for all the Hamilton Partners. Discovery was then conducted over the course of several months. Following a seven-week trial, the court found the naming of American Appraisal Associates, Inc., was a material, bargained-for term of the parties' Letter of Intent and that the use of anyone other than American, including an entity subcontracted by American, was a breach of the Letter of Intent. It relatedly concluded that the evidence showed Shlaes was not a subcontractor of American and that Hamilton Partners was equally bound by its own conduct or the conduct of other persons acting as its agent.

The court further found that Hamilton Partners had *not* knowingly and intentionally waived Crow's breach of the Letter of Intent, but that Hamilton Partners' conduct subsequent to Crow's breach of the Letter of Intent (that is, proceeding to arbitration despite the Shlaes-prepared appraisal report) waived only its right to enforcement of the Draconian remedy provided therein. Finally, the court set aside the arbitrator's val-

uation award and directed the parties to submit a new plan for appraisal and arbitration.

Pursuant to the court's order, the parties subsequently entered into an agreed order for rearbitration, expressly reserving therein the right to appeal, *inter alia*, from the court's order vacating the first arbitration award. Crow's new appraiser, John Shanahan, valued the Office Park at $21.4 million ($1.4 million less than the first appraisal) and the Business Park at $12.9 million ($1.9 million less). Hamilton Partners' new appraiser, William McCann, valued the Office Park at $55.3 million (approximately $12 million less than the first appraisal) and the Business Park at $19.5 million ($3 million less). In July 1989 the arbitrator, Guy A. Romito, assigned a value of $55.3 million to the Office Park and $19.5 million to the Business Park, the identical values assigned by Hamilton Partners' appraiser. The practical effect of the rearbitration was an award to Hamilton Partners of $8,535,000, which was its proportionate share of the rearbitrated values.

Crow's motion to vacate the rearbitration award was summarily denied, as was its motion to reconsider that denial, and it filed the instant appeal.

Crow raises three issues, the first of which, it asserts, is dispositive: (1) whether the court erred in vacating the first arbitration award because Hamilton Partners waived its right to object to Crow's use of a substitute appraiser by proceeding to arbitration with knowledge of the substitute appraiser without objection thereto; (2) whether, after rearbitration, the court erred in failing to hold an evidentiary hearing where Crow's uncontroverted pleadings and affidavits established a *prima facie* case for vacating the award; and (3) whether the court erred in awarding Hamilton Partners prejudgment interest on the difference in value between the first and second arbitrations when that difference was an unliquidated amount until after the rearbitration results were announced.

We believe the first issue is dispositive and should be decided in Crow's favor. Crow argues that, although the court correctly determined that Hamilton Partners' conduct in proceeding to arbitration with knowledge of Crow's breach of the Letter of Intent without objection waived its right to the "Draconian" remedy, it should also have found that that same conduct waived the breach itself and it should not have vacated the award and ordered rearbitration.

Hamilton Partners responds that it did not and could not waive Crow's breach because it did not know until *after* arbitration the extent of Crow's concealment and fabrication of the Shlaes/American relationship, that it had a right to proceed to arbitration under the circum-

stances, and that Crow owed it a fiduciary obligation which should estop it from claiming waiver in the face of its deliberate concealment.

■■ It is fundamental that objections to defects in arbitration proceedings are waived if a party fails to raise them after becoming aware of them and before the arbitration decision is announced. (*Jean A. Mc-Coy & Sons, Inc. v. La Salle County* (1977), 48 Ill. App. 3d 802; *Wechsler v. Gidwitz* (1928), 250 Ill. App. 136; *Seaton v. Kendall* (1895), 61 Ill. App. 289, *aff'd* (1898), 171 Ill. 410.) In *Seaton*, for example, the parties proceeded to arbitration although one of the parties knew that the other party had an *ex parte* conversation with the arbitrator. When that party sought to prevent enforcement of the arbitrator's award and have it vacated, the court, noting that party's knowledge of the conversation and failure to withdraw the matter from submission to the arbitrator as he might have, stated:

> "We think that he cannot be permitted thus to experiment with the tribunal he had agreed in creating, to occupy the position that he would rest content with its judgment if in his favor, while he held in reserve a complaint he would make if he was not satisfied with the decision. His silence, after he became aware of what he now terms improper conduct, must be regarded as a waiver of such impropriety." *Seaton v. Kendall,* 61 Ill. App. at 293.

Essentially the same thing occurred in *Jean A. McCoy & Sons, Inc.* In that case the county refused to allow McCoy's claim for extras in its construction contract with the county, and an arbitration was called pursuant to the terms of the contract. Later in the evening on the date the arbitrator held a hearing on the matter, an officer of McCoy entered a restaurant and observed the arbitrator having a drink with members of the county board and their witnesses at the arbitration hearing. The McCoy officer joined the party, and the arbitrator left shortly thereafter. McCoy raised no objection to this meeting between the arbitrator and the county representatives until after the arbitrator's unfavorable award against McCoy was announced. McCoy was successful in overturning the arbitrator's decision in the circuit court, and the county appealed.

On appeal, the circuit court was reversed and the cause remanded with directions to reinstate the arbitrator's decision. Acknowledging the impropriety of the arbitrator's *ex parte* communication with the county representatives, but relying on *Seaton* and *Wechsler,* the court found *McCoy* waived the misconduct by not mentioning it until after the arbitrator's decision was handed down. *McCoy,* 48 Ill. App. 3d at 803-04; see also *Wechsler,* 250 Ill. App. 136 (complainant waived objection to the bias of one of the arbitrators where he knew of it before the rendition of

the award but did not make any complaint until after the rendition of the award).

Hamilton Partners seeks to avoid the control of this precedent over the instant cause on several grounds. First, it argues the above cases involved misconduct by the arbitrator rather than one of the parties as is the case here. We do not find that to be a distinguishing feature. The gist of the waiver found in *Seaton, Wechsler* and *Jean A. McCoy & Sons, Inc.* was simply that the complaining party had knowledge of either a defect, impropriety or irregularity prior to the arbitration decision being made but did not make any objection thereto until after an unfavorable arbitration decision was rendered. That is the same situation claimed here by Crow. Hamilton Partners had knowledge of Shlaes & Company's involvement prior to the issuance of the arbitrator's decision but did not object to it until after the arbitrator's unfavorable decision was issued.

This prompts Hamilton Partners' second distinguishing feature, that it was unaware of the true nature of Shlaes' employment by Crow and of Crow's efforts to keep it from that knowledge by drawing American Appraisers back into the picture and creating the false subcontractor arrangement between Shlaes and American. Hamilton Partners claims the instant cause is not a waiver case but, rather, a misrepresentation case, and Crow should be estopped from claiming waiver due to the numerous misrepresentations it made to Hamilton Partners. Analyzed either way, we nonetheless conclude Hamilton Partners cannot avoid the controlling law.

It is clear that the submission to arbitration is accomplished by the agreement of the parties, and the arbitrators and courts can only carry it into effect according to its terms and conditions. However, "the parties may undoubtedly waive or dispense with any of its terms, in precisely the same mode that they may those of any other contract, either by an express or implied agreement." (*Buntain v. Curtis* (1862), 27 Ill. 373, 377-78.) The waiver of a term or a condition of a contract has its usual meaning, that is, the voluntary and intentional relinquishment of a known right. (17 Am. Jur. 2d *Contracts* §658 (1991).) The waiver of a provision of a contract is, in effect, a modification of the contract and, once a waiver is made, it cannot be revoked without the consent of the other party. (28 Am. Jur. 2d *Estoppel and Waiver* §156 (1966).) Ignorance of a material fact negatives waiver, however, and waiver is not established where the consent was given under a mistake or misapprehension of fact. (28 Am. Jur. 2d *Estoppel and Waiver* §158 (1966).) The applicability of waiver focuses on the intent of the nonbreaching party (*Wald v. Chicago Shippers Association* (1988), 175 Ill. App. 3d 607, 621;

*Whalen v. K mart Corp.* (1988), 166 Ill. App. 3d 339, 343), and waiver may be inferred when the party relinquishes a known right either expressly or by conduct that is inconsistent with an intent to enforce that right (*Wald*, 175 Ill. App. 3d at 621; *Hahn v. A.G. Becker Paribas, Inc.* (1987), 164 Ill. App. 3d 660, 670; *Jean A. McCoy & Sons, Inc.*, 48 Ill. App. 3d at 804). In order to waive a claim, it is not necessary that a party be certain of the correctness of the claim and its legal efficacy; it is enough that he knows of the existence of the claim and its reasonably possible efficacy. 28 Am. Jur. 2d *Estoppel and Waiver* §158 (1966).

As to estoppel, a court will apply estoppel if:

"(1) the defendant has misrepresented or concealed a material fact; (2) the defendant had either actual or implied knowledge that the representations were untrue at the time they were made; (3) the plaintiff was unaware that the representations were untrue both at the time they were made and the time that they were acted upon; (4) the defendant intended or expected the plaintiff to act upon the misrepresentations; (5) the plaintiff did rely or act upon the defendant's representations; and (6) the plaintiff, by acting upon the basis of defendant's representations, would be prejudiced if the defendant was not estopped. [Citation.] The party claiming estoppel must have had no knowledge or convenient means of discovering the true facts." *Dodd v. Cavett Rexall Drugs, Inc.* (1988), 178 Ill. App. 3d 424, 436.

A party seeking relief as a result of another party's fraudulent misrepresentations must have had a right to rely on them. That is, the misrepresentations must be viewed in the light of all the facts of which the party had actual notice and those of which he might have availed himself by the exercise of ordinary prudence. *Schmidt v. Landfield* (1960), 20 Ill. 2d 89, 94; *MBC, Inc. v. Space Center Minnesota, Inc.* (1988), 177 Ill. App. 3d 226, 230-31.

Generally, questions of waiver and estoppel are for the trier of fact. (*Aetna Casualty & Surety Co. v. Oak Park Trust & Savings Bank* (1988), 168 Ill. App. 3d 1000, 1004.) If the facts necessary to constitute either waiver or estoppel are in dispute or if reasonable minds might differ as to the inferences to be drawn from the facts in evidence, then both issues become questions of fact. (*Pantle v. Industrial Comm'n* (1975), 61 Ill. 2d 365, 369.) Where there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, it is a question of law whether the facts proved constitute estoppel. *Pantle*, 61 Ill. 2d at 369.

As noted above, based on the evidence it received at the 28-day hearing on Hamilton Partners' motion to enforce the Letter of Intent,

the court found that the use of anyone other than American, including anyone acting as a subcontractor of American, was a breach of the Letter of Intent and that Crow breached the Letter of Intent by delivering an appraisal prepared by Shlaes & Company rather than American. It further found Hamilton Partners *did not* knowingly and intentionally waive its right to an appraisal prepared by American but that by its conduct subsequent to the breach, it *did waive* its right to have the Draconian remedy enforced.

Based on our review of the record, we find there was no dispute as to the material facts necessary to constitute waiver and that only one reasonable inference can be drawn: that Hamilton Partners waived its objection to the Shlaes' appraisals by not raising it prior to issuance of the arbitrator's decision. A fact is "material" to the claim in issue when the success of the claim is dependent upon the existence of that fact. *Lindenmier v. City of Rockford* (1987), 156 Ill. App. 3d 76, 88.

The success of Crow's claim below in resisting Hamilton Partners' motion to enforce the Draconian remedy depended upon it being able to establish by a preponderance of the evidence that Hamilton Partners waived its right to specific enforcement of the Letter of Intent, that is, that Hamilton Partners voluntarily and intentionally waived a known right and that such waiver was not the result of ignorance of a material fact or of a mistake or misapprehension of fact. In this regard, ignorance of a material fact means a party was ignorant of a fact which, if known, would have caused him to act differently. *Buechin v. Ogden Chrysler-Plymouth, Inc.* (1987), 159 Ill. App. 3d 237, 248.

When Hamilton Partners first received the Crow appraisals on July 11, it was clear from the transmittal letters and cover sheets that the Hamilton Lakes appraisals had been prepared by Shlaes & Company, not American. Although Lunt testified he did not even recall seeing the transmittal letters, Hamilton and Wauterlek both testified that it was their understanding prior to the completion of the arbitration process that any use of Shlaes, *even as a subcontractor*, was a breach of the Letter of Intent. Hamilton Partners reasonably knew that it had a right to appraisals prepared by American and not by a company to which it subcontracted the work.

Hamilton Partners argues that the transmittal letters and cover sheets caused it to believe it was American rather than Crow which brought Shlaes into the appraisal process and that if it "had known the facts," it "could have objected" and "would have acted differently." Notwithstanding Hammes' attempt to underplay Crow's role in securing the Shlaes appraisals by ambiguously if not outright falsely stating that American "needed assistance"—meaning that *Crow* thought American

needed assistance rather than *American* actually needed assistance— Hammes *did* tell Lunt on July 17 that it *was Crow* which brought Shlaes into the appraisal process, and that fact is not disputed. Lunt, in fact, testified that during the July 17 discussion with Hammes, he chided Hammes concerning Hamilton Partners' feeling that Crow had not been "straightforward" with Hamilton Partners about bringing Shlaes into the process and that it was "not right" that Crow used Shlaes without checking with Hamilton Partners or getting its approval. As noted above, the joking manner in which Lunt scolded Hammes for Crow's sleight was due to the fact that by that date, July 17, Hamilton Partners had already decided to accept the Shlaes appraisals and proceed with the arbitration. As Hamilton and Lunt both testified concerning Hamilton Partners' decision to proceed, they were not trying to break the deal or to derail the execution of the agreement; they were trying to see it successfully concluded so it could obtain control over its Hamilton Partners' properties.

· Coupling Hammes' admission of Crow's involvement in securing the Shlaes appraisals with Lunt's knowledge at that time that Shlaes and Ryan had a prior business relationship, Lunt, whom the court found to be acting as Hamilton Partners' agent, was possessed of all the material facts needed in order to make a voluntary and intentional waiver of its right to receive from Crow. appraisals of the Hamilton Lakes properties prepared by American. Knowledge of the essential and material facts constituting the breach is the only knowledge a party against whom waiver is asserted needs. (*Lake Shore Country Club v. Brand* (1930), 339 Ill., 504, 524; *Ferrero v. National Council of Knights & Ladies of Security* (1923), 309 Ill. 476, 481; *Kennedy v. Hospital Service Corp.* (1983), 118 Ill. App. 3d 584, 588.) We find Hamilton Partners had that knowledge and must be held by its conduct to have waived Crow's breach of the Letter of Intent.

We note that the apparent inconsistency created by the trial court's finding that there was no waiver of the breach but there was a waiver of the remedy based essentially on the same conduct (that is, Hamilton Partners' failure to object to Crow's nonconforming appraisal reports) may be attributable to some confusion concerning the relevant time period in which Hamilton Partners was obligated to make its objection. Counsel for Hamilton Partners argued in closing at trial that a waiver by it of Crow's performance under the Letter of Intent could only occur *prior to* July 11, but that *after* July 11, such waiver would be "impossible as a matter of law." That argument simply was not correct. A person cannot waive a right before he is in a position to assert it. (28 Am. Jur. 2d *Estoppel and Waiver* §157 (1966).) Hamilton Partners was not in

a position to assert its right to appraisals prepared by American until those appraisals were due to be delivered to it, that is, on July 11. Only after that right accrued to it was Hamilton Partners in a position to waive Crow's delivery of the nonconforming appraisals.

We decline to estop Crow from asserting waiver in light of the evidence that shows Hamilton Partners knew before the arbitration decision was issued that it was Crow that brought Shlaes into the appraisal process, not American. Consequently, it cannot be said that Hamilton Partners had "no knowledge of the true facts" or was "unaware that the representations were untrue" before the arbitrator rendered his decision. (*Dodd v. Cavett Rexall Drugs, Inc.* (1988), 178 Ill. App. 3d 424, 436.) Also, notwithstanding its asserted uncertainty and confusion and concern upon receiving the Shlaes appraisals, and in light of the perceived strategic advantage afforded it by the poor quality of those appraisals, Hamilton Partners' attempt to learn the facts of the apparent subcontractor status of Shlaes was not probing enough even to warrant raising the issue with its own attorney or to follow up on Ryan's comment that it was "unusual" to use a subcontractor under the given circumstances or to follow up on Hammes' declaration that American "needed assistance." Lunt acknowledged that it was his understanding as of July 17 that without the use of Shlaes, American would not be able to complete the appraisals on time, in which case Hamilton Partners' appraisals would control pursuant to the Draconian remedy. Whether American *actually* needed assistance is immaterial since Hamilton Partners believed that use of anyone other than American was a breach of the Letter of Intent, and, had it so desired, it could have objected to American receiving such assistance, thus assuring that its appraisals would control. Hamilton Partners' obvious intent was not to object to the use of Shlaes & Company whether it was Crow that brought it into the process or whether it was American.

Moreover, it is evident that Hamilton Partners did not rely upon any of Crow's misrepresentations in deciding to proceed with the arbitration. It had determined not to object to the Shlaes appraisals even before Lunt spoke with Hammes on July 17 because it believed that it "stood in good stead" in the arbitration proceedings given the fact the appraisals were "so low and so poorly written and so devoid of facts that there was no basis for an arbitrated value."

We also reject Hamilton Partners' argument that it was entitled to proceed as it did because it was its "only commmercially reasonable course of action" and, thus, it did not waive its right to relief. Pointing to its status as a "start-up business" and its inability to use or manage the project partnerships it ultimately was to receive under the plan en-

compassed by the Letter of Intent until after the first closing occurred, Hamilton Partners contends it was vitally important that there be a prompt and timely first closing as provided therein and that its actions during the July 11 through 20 time period must be considered in that light. It relies on *Buechin v. Ogden Chrysler-Plymouth, Inc.* (1987), 159 Ill. App. 3d 237, and *Ross v. City of Geneva* (1976), 43 Ill. App. 3d 976, in support of its argument.

We find *Buechin* and *Ross* distinguishable, however, since those cases concerned the issue of whether the respective plaintiff in each case had waived legal or statutory remedies by the voluntary payment of money. In *Buechin*, plaintiff voluntarily paid for what she believed was a "new" car (that is, one "that had not been owned by anybody else, taken off the lot and in their possession") and then discovered that the car had been in another's possession for about two weeks. (*Buechin*, 159 Ill. App. 3d at 241-42.) We rejected the defendant's claim there that plaintiff's voluntary payment waived her cause of action for fraud and for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*). Noting that plaintiff signed the binding contract to purchase the car before she learned of the other person's possession of the car, that she attempted to exercise her statutory remedy of revoking her acceptance of the car under the Uniform Commercial Code (Ill. Rev. Stat. 1985, ch. 26, par. 2—608) and, alternatively, that she did exercise her option to seek her common-law remedies by her complaint for fraud, we concluded that plaintiff "merely continued to perform a partially executed contract since it would have been prejudicial to discontinue performance, and, therefore, [plaintiff] did not waive her right to damages for fraud." (*Buechin*, 159 Ill. App. 3d at 251.) In *Ross*, we found that the plaintiff's voluntary payment of a 10% surcharge imposed by ordinance on him and other commercial users of electricity produced by the defendant in its capacity as a public utility did not constitute a waiver of plaintiff's right to recovery or destroy the basis for a class suit. We determined such payment was the businessman's "only commercially reasonable course of action" in light of the evidence that the policy of the defendant, which was the sole provider of electricity to the commercial enterprises concerned, was to terminate the electrical supply to users for nonpayment of imposed charges and that it had so terminated services pursuant to that policy. *Ross*, 43 Ill. App. 3d at 984-85.

In contrast to the situations in *Buechin* and *Ross*, Hamilton Partners and Crow agreed here that the provisions of the Letter of Intent would be specifically enforceable against each other because damages

would be an inadequate remedy, and the instant cause was prompted by Hamilton Partners' emergency motion for enforcement of the Draconian remedy. As we have found above, Hamilton Partners waived its right to Crow's strict compliance with the appraisal provisions by failing to raise an objection to its nonconforming performance before the arbitration decision was issued. Unlike Buechin, who attempted to and did exercise her various legal and statutory remedies after she discovered the defendant's fraud, or Ross, who objected to the surcharge from the receipt of the first bill which separately itemized it, when Hamilton Partners received Crow's nonconforming appraisal and later learned that Crow was the initiating force behind it, it did not seek either to immediately specifically enforce its right to a conforming performance from Crow before proceeding to arbitration or even attempt to preserve an objection to Crow's nonconforming performance by raising a formal objection to it to the arbitrator. One or the other of these actions would have been the most "commercially reasonable course of action." (See generally *Jones Dairy Farm v. Local No. P—1236* (7th Cir. 1985), 760 F.2d 173, 174-75.) Instead, the Shlaes appraisal reports were unreservedly submitted for arbitration, and, even if it could be said that the appraisals were the wrong basis on which the award should have been calculated, the arbitrator's decision could not be vacated on that basis. (Ill. Rev. Stat. 1989, ch. 10, par. 112; *Seither & Cherry Co. v. Illinois Bank Building Corp.* (1981), 95 Ill. App. 3d 191, 195-96.) Further, it is well settled that "[a] party to a contract may not lull another into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance." *Whalen v. K mart Corp.* (1988), 166 Ill. App. 3d 339, 343.

Finally, we reject Hamilton Partners' argument that Crow, as managing partner, owed it, as limited partners, fiduciary obligations which absolutely barred Crow from claiming waiver in the face of its own deliberate concealment.

█ █ It is well established that all partners are fiduciaries for one another and each partner is bound to exercise the utmost good faith and honesty in all dealings and transactions relating to the partnership. (*Couri v. Couri* (1983), 95 Ill. 2d 91, 98; *Bakalis v. Bressler* (1953), 1 Ill. 2d 72, 78-79.) Dissolution of the partnership ends the fiduciary relationship (*Babray v. Carlino* (1971), 2 Ill. App. 3d 241, 250-51; *Bluestein v. Davis* (1967), 86 Ill. App. 2d 61, 67) except for purposes of an accounting or the winding up of the partnership's affairs. (*Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 438; *Mandell v. Centrum Frontier Corp.* (1980), 86 Ill. App. 3d 437, 450; Ill. Rev. Stat. 1989, ch. 106½, par. 30.) The partnership relationship does not extend to all af-

fairs and transactions between partners, however (see *McDonald v. McDonald* (1951), 408 Ill. 388, 394), and when the partners have entered into an arm's length transaction in order to effect dissolution, their relationship is not fiduciary in nature. *Babray*, 2 Ill. App. 3d at 251.

██ It is apparent that when Crow and Hamilton Partners executed the Letter of Intent, the admitted purpose of which was to sever the partnership relationship, they were dealing at arms' length and their relationship was not fiduciary in nature.

We conclude it was error for the trial court to vacate the first arbitration decision. In light of this conclusion, we do not address the other issues raised by Crow. The judgment of the circuit court of Du Page County entered *nunc pro tunc* June 16, 1988, vacating the first arbitration award is reversed, and its subsequent orders entered in connection with the rearbitration are vacated. The cause is remanded with directions to reinstate the first arbitration award.

Reversed and remanded.

REINHARD, P.J., and GEIGER, J., concur.