GEORGE G. KERASOTES *et al.*, Plaintiffs-Appellees and Cross-Appellants,
v. ESTATE OF NICHOLAS G. KERASOTES *et al.*, Defendants-Appellants
and Cross-Appellees.

Fourth District   No. 4—91—0856

Opinion filed December 17, 1992.

Craig A. Randle and James R. Potter, both of Londrigan, Potter & Randle, P.C., of Springfield, for appellants.

Patrick J. Cadigan, of Hinshaw & Culbertson, of Springfield, and Bryan Cave, Mark S. Deiermann, and W. James Nabholz III, all of St. Louis, Missouri, for appellees.

JUSTICE COOK delivered the opinion of the court:

This action arises out of financial disputes following the dissolution of the Kerasotes theater business. The trial court resolved the disputes and awarded plaintiffs certain monies. Defendants appeal, arguing the court erred by (1) holding that Kerasotes Enterprises Partnership had a duty to indemnify plaintiff, GKC Theaters, Inc. (GKC Theatres) (formerly Kerasotes-Rialto Theatres, Inc. (Kerasotes-Rialto)), for money Kerasotes-Rialto paid to settle a lease dispute with the owner of the Pioneer drive-in; (2) awarding plaintiff GKC Theatres additional money for soft drink rebates and Screen Vision advertising revenues; (3) awarding plaintiff GKC Theatres money for certain missing equipment claims; and (4) awarding plaintiffs prejudgment interest. Plaintiffs cross-appeal, contending the trial court erred by (1) failing to award plaintiff GKC Theatres the proper amount of SuperSaver income to which it was entitled; (2) failing to award plaintiff GKC Theatres the proper amount for soft drink rebates and Screen Vision advertising revenues; (3) failing to compensate plaintiff GKC Theatres for certain missing equipment claims; and (4) holding plaintiff GKC Theatres responsible for the interest on the mortgage of the Castle theater and Castle's property taxes. We affirm in part, reverse in part, and remand with directions.

## I. BACKGROUND

The Kerasotes theater chain was operated through various corporations and partnerships owned, jointly or individually, by the four

Kerasotes brothers, George, Louis, Nicholas, and John. Each possessed a personal corporation bearing his name: George G. Kerasotes Corporation, Louis G. Kerasotes Corporation, John G. Kerasotes Corporation, and Nicholas G. Kerasotes Corporation. The individual theaters were operated by five separate corporations: (1) Kerasotes Illinois Theaters, Inc.; (2) Kerasotes-Rialto Theaters, Inc.; (3) Kerasotes Indiana Theaters, Inc.; (4) Kerasotes Iowa Theaters, Inc.; and (5) Kerasotes Missouri Theaters, Inc. These theater corporations, in turn, were owned by the brothers in their individual capacities or through their personal corporations. Each brother also owned a one-fourth interest, through his personal corporation, in Kerasotes Enterprises Partnership (Kerasotes Enterprises) and a one-fourth interest, in his individual capacity, in Kerasotes Management Partnership (Kerasotes Management). Kerasotes Enterprises contracted with the theater corporations to provide management and administrative services, for which it received a percentage of the gross revenues of the theater corporations. It, in turn, delegated the administrative and managerial services by contract to the four personal corporations. Kerasotes Management provided loans to the theater corporations that were in need of funds. Additionally, the parties held interests in two building partnerships, Kerasotes 106 Building Partnership and Kerasotes Building Partnership.

A number of disputes arose between the parties with regard to the general management and operation of the theater business. In an attempt to resolve the disputes, the parties entered into a dissolution agreement on September 13, 1985, which sought to terminate any future business relationships between them and to divide the assets of the theater business. Under the provisions, defendants were to transfer their shares of Kerasotes-Rialto to plaintiff George Kerasotes, vesting 100% ownership of this corporation in him, and he was to transfer his shares in Kerasotes Illinois, Indiana, Iowa, and Missouri theaters to the defendants, vesting 100% ownership of these corporations in them.

After the agreement, disputes developed regarding the amount plaintiffs were to receive under the agreement, and on January 26, 1987, plaintiffs filed a 14-count complaint against defendants; they subsequently filed an amended 10-count complaint. Plaintiffs sought the following: (1) damages resulting from breach of contract (counts I, II, III); (2) an accounting of Kerasotes Enterprises pursuant to sections 21 and 22 of the Uniform Partnership Act (Act) (Ill. Rev. Stat. 1991, ch. 106½, pars. 21, 22) (count IV); (3) a dissolution and accounting of Kerasotes Management pursuant to sections 21 and 22 of the

Act (Ill. Rev. Stat. 1991, ch. 106½, pars. 21, 22) (count V); (4) damages resulting from a breach of fiduciary duty (counts VI and VII); (5) damages for tortious interference with contract (counts VIII and IX); and (6) damages for civil conspiracy (count X).

On May 12, 1988, plaintiffs filed a motion for an accounting and to compel distribution of the assets of Kerasotes Management, which the court denied. On March 2, 1990, plaintiffs filed another motion for an accounting. In essence, this motion sought to bifurcate counts IV and V of the amended complaint. The court granted this motion.

An evidentiary hearing dealing with the accounting issues was held on November 13 and 14, 1990. By the time the evidentiary hearing was completed, the parties had settled several claims. The issues still in dispute were disposed of by letter rulings issued by the trial court on February 20, March 19, and March 27, 1991.

On October 22, 1991, the court entered two written orders *nunc pro tunc* to October 15, 1991. The court found that the George G. Kerasotes Corporation (GGK Corporation) was owed $66,534 plus $53,637 in interest, for a total of $120,171. It further found plaintiff GKC Theatres owed defendants $70,418 plus $56,768 in interest, for a total of $127,186. It took the net difference between the amounts and entered judgment in the amount of $7,015 in favor of defendants. In the second order, the court found plaintiff George Kerasotes was owed $230,961 plus $186,192 in interest from the defendants. Accordingly, it entered judgment in favor of plaintiff in the amount of $417,153. This appeal followed.

## II. Pioneer Drive-in

Prior to the dissolution, Kerasotes-Rialto leased the Pioneer drive-in. The only parties to the lease were Kerasotes-Rialto and the landlord. In 1986, after the dissolution agreement had been executed, the lease expired and the owner of the drive-in asserted various claims against Kerasotes-Rialto. No claim was made against George Kerasotes, individually, the defendants, or any other theater corporation. GKC Theatres settled the dispute, and under the terms of the agreement, only GKC Theatres was released from liability. The defendants were neither parties to the settlement or released from liability, nor did they receive notice of this settlement.

The trial court held the cost of the settlement should be shared equally among the parties, and accordingly awarded judgment in the amount of $71,584, representing three-fourths ·of the settlement, to GKC Theatres. Defendants argue the trial court erred in making such a ruling because it was contrary to the express provisions of the dis-

solution agreement, which released defendants from such liability. We agree.

A release is a contract, and, therefore, its construction and interpretation is governed by rules of contract law. (*Murphy v. S-M Delaware, Inc.* (1981), 95 Ill. App. 3d 562, 565, 420 N.E.2d 456, 459.) Under these rules, the trial court is to interpret the scope and effect of the release in a manner consistent with the intent of the parties at the time of its execution. The intention of the parties to the contract must be determined from the instrument itself and construction of the instrument where no ambiguity exists is a matter of law. *Farm Credit Bank v. Whitlock* (1991), 144 Ill. 2d 440, 447, 581 N.E.2d 664, 667.

The agreement states that "the parties [were] desirous of resolving all of their disputes and terminating all future business relations." It further provides that plaintiff George Kerasotes was to:

"hold the [defendants] and Kerasotes Illinois Theaters, Inc., Kerasotes Indiana Theaters, Inc., Kerasotes Iowa Theaters, Inc.[,] and Kerasotes Missouri Theaters, Inc.[,] harmless and indemnify them from any liability arising from any indebtedness or claim, direct or contingent, arising out of the operation of Kerasotes-Rialto Theater, Corporation, including but not limited to the indebtedness set out on Exhibit E as GGK debt."

Exhibit E is a list of cities in which Kerasotes-Rialto operates theaters. Defendants also provided George Kerasotes and Kerasotes-Rialto with a similar release, holding them harmless from any liability arising out of the operations of Kerasotes Illinois, Iowa, Indiana, and Missouri.

The agreement is unambiguous and clearly contemplates that claims asserted against individual theater corporations would be the sole responsibility of the party or parties receiving ownership of the particular corporation under the dissolution agreement. The agreement specifically states that plaintiff George Kerasotes would hold harmless and indemnify defendants on any liability arising out of the operation of Kerasotes-Rialto. The claim at issue falls precisely within the purview of this provision: it is based on the operation of Kerasotes-Rialto because Kerasotes-Rialto leased the property.

Plaintiffs, however, argue the release does not encompass this claim because the claim is based on damages to the property which occurred prior to the dissolution, while Kerasotes Enterprises managed the drive-in. That interpretation of the agreement is inconsistent with the express provisions of the agreement and the intent of the parties. The agreement does not distinguish between claims based on

predissolution or post-dissolution activities, but rather seeks to resolve all claims. To effectuate this intent, the parties provided each other with reciprocal releases. Although this claim is based on alleged activity occurring before the dissolution, the comprehensive nature of the release is indicative of the parties' intent to release each other from such claims. Moreover, the agreement specified the claims in which the parties would share in the cost of the defense and any settlement agreed to by the parties. The only circumstances in which the parties would share in third-party liability were those that were "asserted against them *jointly* arising out of the business relationship." (Emphasis added.) The present claim was not asserted against the parties jointly, but against Kerasotes-Rialto solely. Therefore, we reverse the trial court's ruling on this issue.

### III. Soft Drink Rebates And Advertising Revenue

Screen Vision paid each theater a fixed amount of money to run its advertisements on the screen before the movie started. Since at least 1982, the advertising revenue received from this practice was recorded as income of Kerasotes Enterprises, rather than the individual theater corporations. The soft drink rebates were similarly treated. Due to the volume of soft drinks purchased cumulatively by Kerasotes Enterprises, the soft drink manufacturers issued rebates. Since at least 1976, these rebates were treated as assets of Kerasotes Enterprises as opposed to the theater corporations.

The dissolution agreement specified that the net assets of Kerasotes Enterprises were to be divided equally among the four personal corporations and that an audit was to be conducted to certify the assets. The audit included as assets of Kerasotes Enterprises the advertising income and soft drink rebates. Plaintiffs alleged GKC Theatres was entitled to an additional $34,920 of the advertising revenue and $7,913 from the soft drink rebates because its predecessor, Kerasotes-Rialto, generated more of those rebates than the other corporation. These amounts owed were derived by determining the amount of advertising revenue and soft drink rebates earned by Kerasotes-Rialto less the 25% GGK Corporation was to receive in the distribution of the assets.

The trial court held the advertising income and soft drink rebates were to be divided equally. It then apparently took plaintiffs' figures of $34,920 and $7,193, divided them by four and awarded each brother's corporation $8,730 in additional advertising revenue and $1,798 in soft drink rebates.

On appeal, plaintiffs argue by cross-appeal that the trial court erred in that GKC Theatres should have received the full amount. To support this, plaintiffs argue Dennis Kerasotes, controller of Kerasotes theaters, incorrectly listed the revenue as income of Kerasotes Enterprises. Rather, it should have been handled as income of the individual theaters. Plaintiffs further allege that George Kerasotes was not aware of the accounting procedure until the dissolution, and because defendants failed to provide a "full and frank disclosure" to him, this issue should be resolved in their favor.

Conversely, defendants argue it was error for GKC Theatres to receive any additional money from the advertising revenue and the soft drink rebates because the intent of the parties was to divide the assets of Kerasotes Enterprises based on the existing "books and records" of the partnership. The "books and records" listed advertising revenue and soft drink rebates as assets of Kerasotes Enterprises. Defendants assert this revenue was divided equally among the parties and the trial court erred in awarding GKC Theatres additional money. We agree.

The parties do not dispute that at the time of the settlement, and for a number of years prior, the advertising revenue and soft drink rebates were treated as income of Kerasotes Enterprises. The audit reflected this, and these amounts were included in determining the net assets of Kerasotes Enterprises. It does not sit well for plaintiff George Kerasotes, who was the president and chief executive officer of Kerasotes Enterprises, to now allege the accounting procedure employed for many years was incorrect and that he did not know that the advertising revenue and soft drink rebates would be included as revenue of Kerasotes Enterprises.

The dissolution agreement provided that "[t]o the extent the assets exceed[ed] the liabilities" they would be divided equally among the four personal corporations. The parties further agreed that *after* the execution of the agreement an audit of the books and records of the partnership would be conducted to certify the assets and liabilities of each partnership. Plaintiffs are bound by this agreement and cannot now disregard the terms of it simply because they have discovered the terms are less profitable to them than they anticipated when they entered into it. (*Diedrich v. Northern Illinois Publishing Co.* (1976), 39 Ill. App. 3d 851, 857-58, 350 N.E.2d 857, 862.) Moreover, courts cannot rewrite contracts to suit either party, but must enforce their terms as written. (*Fleisher v. Lettvin* (1990), 199 Ill. App. 3d 504, 514, 557 N.E.2d 383, 389.) The money the trial court held should be divided was money that had already been included in the

determination of the net assets of Kerasotes Enterprises, and which was to be divided equally among the four personal corporations pursuant to the terms of the agreement. Under the terms of the agreement none of the parties were entitled to additional money from the advertising revenue or soft drink rebates.

IV. Missing Equipment

After the dissolution agreement had been executed, George Kerasotes conducted inventories of the Bloomington drive-in, and the Irvin, Castle, and Avon theaters and claimed that equipment that was in the theaters before the agreement was not there subsequently. He therefore asked the trial court to award GKC Theatres money for the missing equipment from these theaters.

Plaintiff George Kerasotes testified he inspected the Bloomington drive-in after the break-up of the business and discovered that all the projection and concession equipment was gone (valued at $11,186). It was his understanding that a complete set of projection and concession equipment, all that was necessary to run a drive-in, should have been there. As to the Irvin theater, he alleged that certain equipment had been taken from the theater and transferred to various other Kerasotes theaters. In a letter dated September 27, 1985, he wrote Dennis Kerasotes stating that the following charges were due Kerasotes-Rialto for the transferred equipment: (1) $7,320 for 732 seats which were sent to the Broadway theater, (2) $2,500 for a compressor sent to Mattoon, and (3) $4,000 for a new boiler sent to the Rogers theater in Poplar Bluff. Plaintiff George Kerasotes contended he was still owed for these items because this equipment was originally owned by the Irvin theater, and GKC Theatres should be compensated for its removal.

With respect to the missing equipment from the Avon and Castle theaters, the dissolution agreement provided for the sale of four theaters, including the Castle and Avon, from Kerasotes Illinois to Kerasotes-Rialto for $168,436.10. George Kerasotes took possession of these theaters on October 1, 1985. It was his understanding that the purchase price included all items relating to the property. He asserted, however, that several items were missing from the theaters, including two "Kelmar solar cells," a "Dolby processor" and an "Altec A-4 speaker system" (valued at $2,380) from the Avon theater and two "Kelmar solar cells" and a "Dolby processor" (valued at $1,980) from the Castle theater. Marshall Selkirk, executive vice-president of finance for the George G. Kerasotes Corporation, testified that inventories had been conducted and this equipment was supposedly at the

theaters at the time the dissolution agreement was executed but was subsequently removed by defendants. On cross-examination, he admitted he had no personal knowledge of the missing equipment or the inventories but rather received his information from employees of the corporation.

The trial court held that plaintiff GKC Theatres should not receive any money for the missing equipment from the Bloomington drive-in or the Irvin theater, but awarded it $4,350 for the missing equipment from the Castle and Avon theaters. On appeal, plaintiffs argue the trial court erred in not awarding GKC Theatres money for the missing equipment from the Bloomington and Irvin theaters. Defendants argue the trial court erred in awarding GKC Theatres money for the missing equipment from the Castle and Avon theaters because plaintiffs failed to establish that Kerasotes-Rialto owned the equipment, that it was present in the theaters before the agreement, and that it was removed thereafter.

■ The dissolution agreement does not specifically address what the transfer or purchase of the theaters encompassed. However, the clear intent of the parties was to resolve all disputes and terminate any future business relations. It seems that to effectuate this intent the parties meant to include in the transfer or purchase of the theaters all personal property in the theaters. Therefore, to the extent plaintiffs could prove that certain equipment was at the theaters at the time of the agreement was executed and not afterward, plaintiffs would be entitled to compensation for that equipment. Plaintiffs presented testimony at the accounting hearing, albeit minimal, that inventories of the Avon and Castle theaters had been conducted and certain equipment was missing. While the inventories were not entered into evidence, there is some evidence to support the court's ruling. Therefore, it cannot be said that the ruling is against the manifest weight of the evidence so that an opposite conclusion is warranted.

As to plaintiffs' claim for compensation for missing equipment from the Irvin theater, the trial court properly denied it. Plaintiff George Kerasotes knew almost a year before the dissolution agreement was executed that certain equipment had been transferred to other theaters. Because the agreement intended to resolve all disputes between the parties, it appears this claim was incorporated and settled by the dissolution agreement.

The trial court did not award any money to GKC Theatres for the missing equipment from the Bloomington drive-in. Plaintiffs, however, presented relatively the same evidence with regard to this missing

equipment claim as to the Avon and Castle theater equipment claims. The trial court gave no explanation for its contrary rulings. Since the court found there was sufficient evidence to support an award for the missing equipment from the Castle and Avon theaters, there should have been sufficient evidence to support an award for the equipment missing from the Bloomington drive-in. Therefore, we hold the trial court should have awarded GKC Theatres money for this claim.

## V. PREJUDGMENT INTEREST

■ Generally, there is no right to recover prejudgment interest unless it is permitted by statute or there is an agreement between the parties. (*City of Peoria Municipal Employees Association v. City of Peoria* (1991), 217 Ill. App. 3d 550, 556, 577 N.E.2d 819, 823; *In re Marriage of Pitulla* (1990), 202 Ill. App. 3d 103, 118, 559 N.E.2d 819, 831; *Alguire v. Walker* (1987), 154 Ill. App. 3d 438, 447, 506 N.E.2d 1334, 1341.) The dissolution agreement did not contain a provision for interest nor do plaintiffs rely on any statute to permit the award of interest in this case. Rather, plaintiffs, relying on *In re Estate of Wernick* (1989), 127 Ill. 2d 61, 535 N.E.2d 876, assert they were entitled to prejudgment interest based on equitable considerations.

■ The trial court agreed and awarded plaintiffs prejudgment interest at the prime rate. The apparent reason for the court's ruling was to make plaintiffs whole due to the fact defendants owed them money under the dissolution agreement. Defendants recognize that under *Wernick* a court can award interest in the "exercise of its equitable jurisdiction," but argue that the issues decided by the court were not equitable in nature and, therefore, did not give rise to an equitable award of prejudgment interest. Defendants assert that to maintain a suit for an equitable accounting, as opposed to suing in law on an account, plaintiffs must establish the absence of an adequate legal remedy. Since the parties asked for a specific dollar amount for each disputed claim and the court awarded them money judgments, an adequate legal remedy existed, and the court's equitable jurisdiction was not invoked. An equitable award of prejudgment interest, therefore, could not be given.

■ ■ Defendants' assertion that the proceeding was not an equitable accounting is without merit. The burden of proof in a suit for an equitable accounting is on the party that seeks the remedy to prove by a preponderance of the evidence that he has a right to the remedy. (*Kennedy v. Miller* (1991), 221 Ill. App. 3d 513, 520, 582 N.E.2d 200, 205.) Defendants are correct that in general to sustain an action for an equitable accounting, plaintiffs must show that they have no ade-

quate legal remedy. (*Kennedy,* 221 Ill. App. 3d at 520, 582 N.E.2d at 205; *People ex rel. Hartigan v. Candy Club* (1986), 149 Ill. App. 3d 498, 501, 501 N.E.2d 188, 190; 1 Ill. L. & Prac. *Accounting* §3, at 106 (1988).) One instance, however, in which a legal remedy is inadequate and, therefore, a suit in equity for an accounting is appropriate, is where a fiduciary relationship exists between the parties and a duty rests upon the defendant to render an account. (1A C.J.S. *Accounting* §25, at 24-26 (1985); 4 J. Pomeroy, Equity Jurisprudence §1421, at 1077-78 (5th ed. 1941); D. Dobbs, Law of Remedies §4.3, at 252-53 (1973).) Moreover, courts of equity have jurisdiction where fiduciary relations exist, and the fact that there is an adequate remedy at law does not deprive equity of jurisdiction where a fiduciary relationship exists between the parties. (*Mayr v. Nelson Chesman & Co.* (1915), 195 Ill. App. 587, 602; 1 Ill. L. & Prac. Accounting §3, at 106-07 (1988).) The dissolution of the partnership did not end that relationship here since the dissolution of a partnership does not end the fiduciary relationship for purposes of an accounting or the winding up of the partnership's affairs. *Hamilton v. Williams* (1991), 214 Ill. App. 3d 230, 247, 573 N.E.2d 1276, 1288.

▪ The parties in the present case stood in a fiduciary relationship with each other as they were partners in a partnership. (*Couri v. Couri* (1983), 95 Ill. 2d 91, 98, 447 N.E.2d 334, 337; *Bakalis v. Bressler* (1953), 1 Ill. 2d 72, 78-79, 115 N.E.2d 323, 326; *Kennedy,* 221 Ill. App. 3d at 520, 582 N.E.2d at 205; *Hamilton,* 214 Ill. App. 3d at 247, 573 N.E.2d at 1288.) Because a fiduciary relationship existed, a basis to invoke the equitable jurisdiction of the court to provide for an accounting existed. Under these circumstances, an accounting would be ordered without a showing that plaintiffs' legal remedies were inadequate. (See *Hartigan,* 149 Ill. App. 3d at 501, 501 N.E.2d at 190.) The court, therefore, was sitting in equity and could award prejudgment interest if appropriate.

We also find there was sufficient equitable considerations to warrant an award of prejudgment interest.

The supreme court in *Wernick* stated:

"The goal of proceedings sounding in equity is to make the injured party whole. The current trend being employed to accomplish this goal is to allow an award of interest on funds owing so that justice might be accomplished in each particular case. [Citations.] In Illinois, prejudgment interest may be recovered when warranted by equitable considerations, and disallowed if such an award would not comport with justice and equity. [Citations.] Moreover, in equity the amount of interest

allowed need not fall within any precise terms. [Citation.] Whether equitable circumstances support an award of interest is a matter lying within the sound discretion of the trial judge. [Citations.] Such a determination will not be disturbed on review unless it constitutes an abuse of discretion." *Wernick*, 127 Ill. 2d at 86-87, 535 N.E.2d at 887-88.

This litigation has continued for several years and has produced many volumes of record. In these years, the parties had the opportunity to receive interest on the sum which rightfully belonged to the other party. Each, in turn, lost the opportunity to earn interest on the money to which it was entitled. To make the parties whole for the loss of the use of this money, the court could have found awarding prejudgment interest was appropriate. Under the circumstances, the trial court did not abuse its discretion in awarding prejudgment interest to the parties.

Plaintiffs urge that an award of *higher* interest is needed to wholly compensate them for their loss. As stated, the determination of interest is within the discretion of a judge, and it does not seem that the interest awarded inadequately compensated them. The trial court did not abuse its discretion in failing to award plaintiffs interest at a higher rate.

## VI. SUPERSAVER TICKETS

SuperSaver tickets are advance admission tickets sold at discount. These tickets could be used for admission at any of the Kerasotes theaters. When a SuperSaver ticket was sold, the obligation to provide admission was recorded as a general liability of the partnership. When a SuperSaver ticket was used for admission, the admitting theater corporation would redeem the ticket for the purchase price from Kerasotes Enterprises.

Pursuant to the dissolution agreement, Kerber, Eck, and Braeckel conducted an audit of Kerasotes Enterprises. The audit reflected a liability of $408,593 from reduced admission tickets (unredeemed SuperSaver tickets). The firm qualified this amount by noting that due to the nature of the partnership's records they were unable to satisfy themselves as to the proper amount of the liability recorded on the books. Kerber, Eck and Braeckel, however, included the $408,593 in its audit as a liability of the partnership and deducted it from the amount of assets of Kerasotes Enterprises to determine its net assets to be divided among the four personal corporations.

Since the theater corporations were no longer going to be able to redeem the tickets for payment from Kerasotes Enterprises, because

it was going to be dissolved, there would be an additional $408,593 to be divided. The court ordered the unredeemed amount of SuperSaver tickets divided equally among the four personal corporations.

On appeal, plaintiffs argue that GKC Theatres should have received 58.57% ($289,313) of the $408,593 rather than 25% ($102,148). They support this contention by arguing that Kerasotes-Rialto *sold* 58.57% of the tickets and therefore should have received credit on these sales when they were sold. George Kerasotes believed that showing the sale of SuperSaver tickets as a liability of Kerasotes Enterprises was incorrect, but rather it should have been income of the individual theater corporations. As with the soft drink rebates and advertising revenue, plaintiffs now want to change a bookkeeping practice employed for several years to a policy more favorable to them.

The parties do not dispute that, at the time of the audit and the dissolution agreement, the sales of SuperSaver tickets were treated as a liability of Kerasotes Enterprises, and that as of September 30, 1985, the theater corporations could no longer redeem tickets with Kerasotes Enterprises, even though tickets could still be redeemed by patrons at theaters. The parties do not dispute the amount of unredeemed tickets, but do disagree on the distribution of this money.

■■■ The language of the agreement is clear that the net assets of Kerasotes Enterprises were to be divided equally among the four personal corporations. Although technically the unredeemed SuperSaver tickets were characterized as a liability, they were no longer a liability if the partnership was no longer going to redeem them. It was money which was subject to distribution pursuant to the terms of the contract and therefore should have been divided equally. The contract terms appear clear and should be given effect. The trial court correctly divided the money from the unredeemed tickets equally.

## VII. PROPERTY TAXES AND INTEREST ON THE MORTGAGE

Under article V of the dissolution agreement, George Kerasotes agreed "that within thirty (30) days of the receipt of the stock in Kerasotes-Rialto Theater Corporation *** he [would] take all action necessary to effectuate the purchase of [the Castle and Virginia theaters] by Kerasotes-Rialto Theater Corporation from Kerasotes Illinois Theaters, Inc." Upon his failure to effectuate the purchase within 30 days, he obligated himself to purchase the properties within 30 days thereafter. He and Kerasotes-Rialto further agreed "that upon the completion of the purchase provided for in this Article, [George Kerasotes] and Kerasotes-Rialto Theater Corporation [would] hold

Kerasotes Illinois Theaters, Inc.[,] harmless from any indebtedness constituting a lien against the premises as of the date of this Agreement." At the time the agreement was executed, the Castle theater was encumbered by two mortgages from Peoples Bank of Bloomington and American State Bank. Kerasotes-Rialto took possession of the theaters on or around October 1, 1985, and since then has not tendered the purchase price to the defendants nor have defendants transferred title of the theaters to Kerasotes-Rialto. The trial court ordered GKC Theatres to reimburse defendants for the interest paid on the mortgage for the Castle theater and the property taxes paid on the Virginia and Castle theaters.

Plaintiffs argue that GKC Theatres should not be responsible for the accrued interest on the principal and the property taxes because defendants did not transfer title of the properties to GKC Theatres and because interest and taxes which accrued after the date of the agreement are not "indebtedness[es] constituting *** lien[s] against the premises as of the date of" the dissolution to which they agreed to hold defendants harmless.

The agreement is clear that plaintiffs were to hold defendants harmless from any indebtedness constituting a lien against the theaters as of the time of the agreement. The mortgage was a lien on the property prior to the execution of the agreement, and the interest on the mortgages would also be liens on the property. The interest on the mortgage was part of the indebtedness, and defendants would not be liable for this debt. As for the property taxes, although they were not a lien against the property at the time of the agreement, it seems as though the parties' intent was to make plaintiffs responsible for all debts upon their taking possession of the property. Therefore, the trial court did not err in ruling that because plaintiffs had actual possession of the theater GKC Theatres was required to reimburse defendants for interest and taxes paid.

Based on the foregoing reasons, we affirm the trial court's rulings in part, reverse in part, and remand for a recalculation of money owed the parties and interest thereon consistent with this opinion.

Affirmed in part, reversed in part, and remanded with directions.

McCULLOUGH and KNECHT, JJ., concur.